ROBERT REILING, APPELLANT, v. MISSOURI INSURANCE COMPANY, RESPONDENT.—153 S. W. (2d) 79.

Kansas City Court of Appeals. June 16, 1941.

166

*McCune, Caldwell, Downing & Noble, Stanley Garrity* and *Menefee D. Blackwell* for appellant.

168

*Morrison, Nugent, Berger, Byers & Johns, E. R. Morrison, James E. Nugent, Randolph P. Rogers, Jr.* and *J. A. Morrison* for Missouri Insurance Co., respondent.

BLAND, J.—This is an action for damages for personal injuries. There was a verdict and judgment in favor of plaintiff in the sum of $6000. Both of the defendants filed motions for a new trial. Krueger's motion was overruled, but the court sustained the motion of the Missouri Insurance Company, on the ground that it should have given its instruction in the nature of a demurrer to the evidence offered at the close of all of the testimony. The plaintiff has appealed.

The facts show that plaintiff was injured in Kansas City, Kansas, on October 15, 1938, when a motorcycle he was operating northwardly on Waterway Drive came into collision with an automobile owned by the defendant Krueger, at the intersection of Waterway Drive and Nebraska Avenue. For the purposes of the case was may assume that the collision was caused by the negligence of Krueger. The Company is sought to be held on the theory that the relationship of *respondeat superior* existed between it and its co-defendant. This will involve a statement as to the relationship between the two.

On this question the evidence is undisputed and shows that the company is engaged in the insurance business, selling life, health and accident policies on the industrial or weekly payment plan, with its principal offices in the City of St. Louis, and with a branch office in Kansas City, Missouri. It also issued ordinary life insurance policies. Claims for health and accident benefits are paid weekly in cash. Policyholders are grouped geographically in what is called a debit, and collections are made from such policyholders weekly by a representative of the company. These representatives are called debit collectors. When a debit collector starts to work he is assigned a debit or group of policyholders from whom weekly collections are made. The debit collector can increase the debit by writing new business and, at the time weekly collections of premiums are made, he pays in cash weekly benefits on health and accident policies to the policyholders in the debit.

Krueger was a debit collector and had been connected with the company for a number of years prior to the collision. His agreement with the company was not in writing. It was partly verbal but, for the most part, it can be gleaned from the conduct of the company and Krueger in the prosecution of the business. He entered the employment of the company, at its branch office in Kansas City, Missouri, and was given a book containing the names of a number of the company's policy holders, or a debit, which covered a district in Kansas City, Kansas. He was also given a "collection book, premium receipt books, claim blanks, premium receipts, envelopes for policies and policies."

The Company's branch office in Kansas City, Missouri, was in charge of one Leftwick, superintendent. He had nine men, including Krueger, under his supervision. Leftwick, a witness for plaintiff, testified: ''Q. Do you tell the agents how to do their work? A. Well, I give them instructions when I first introduce them. Q. Well, as to what to do or how to do it? A. As to *what* to do,'' (Italics ours.) Krueger's compensation for making collections was entirely on a commission basis. In addition to collecting premiums Krueger also solicited applications for insurance for both industrial policies and for ordinary life. He could solicit insurance not only in the territory of his debit but elsewhere. He received a regular commission for obtaining ordinary life policies and he obtained an increase in his compensation if he increased the amount of his weekly collections on industrial insurance.

Krueger was not given any directions or instructions in regard to making collections. He used his ''own method.'' Leftwick testified: ''We presume the man knows how to make his collections. We just let him use his own way in making his collections as long as it is within the law, legally. Q. Well, you do make suggestions to him, do you not? A. If there is anything out of the way, we do;'' that when one of the company's debit agents goes on a vacation, or is off of his debit, for as much as a week or ten days, the witness, himself, takes his place; that Krueger is required to go over his district at least once a week, but he can put in as many hours or as few as he pleases. After he leaves the office in Kansas City, Missouri, he does not have to report back at all. No one tells him in what order to call upon his customers and he arranges his work so that it will be most convenient to him. He does not have to report with respect as to how he spends his time and whether he works evenings or not, is his own business. The better he keeps his debit up the more profit there is in it for him; that ''the general idea of an insurance man is, he writes his own check; in other words, the harder he works the more he gets paid and the more he produces the more he gets paid on it;'' that it is the duty of Krueger to pay claims when instructed by his superior and to inspect claims. He is instructed to inspect claims only occasionally and the inspecting of claims is for the purpose of ''determining if it is a legitimate claim.'' . . . ''Q. And that is sometimes done by agents such as Mr. Krueger under direction during the—upon the instruction of the manager of the district? . . . ''There is no question about that, is there? A. Really the manager just asks the agent if they will inspect it for him.'' The claims are passed on by the manager of the district and the agent makes the payments of them most of the time. The agent is authorized to make such payments. It is an advantage to the agent to pay claims. It makes it easier to collect from a policyholder who is being paid a claim. These payments are ordinarily made in cash and are frequently met out of the agent's

daily collections. On rare occasions the company gets in touch with Krueger when he is out in his "field" and when that happens the company says to him, "here is a claim, see what you can do with it," and he makes such an inspection as he finds necessary and follows the orders of his superior "to that extent." All of these things are a part of Krueger's regular duties but he receives no compensation for inspecting and paying claims. When his superior hands him a claim to inspect he does not tell him how to inspect it, but to use his "own judgment." The agent does no work other than collect premiums and write additional insurance except when instructed by his manager. The company instructed Krueger and the other debit agents to report each morning at its office in Kansas City, Missouri. It is the primary purpose of these meetings, except those occurring on Friday and Saturday, to afford a means for the agents to turn in any extra cash that they do not want to carry with them, to report the collections that they have made and to report the claims that they have paid, to obtain new policies for which they have previously sent in applications, to file applications for new insurance which they have written and to receive any claims that are to be paid. All this is a part of the duties of the agents. The meetings held on Friday mornings are for the purpose of having the agents make their weekly report on what is called their "account sheet." At these Friday morning meetings the agents make their actual report of what they have done the previous week. A formal report of the policies collected on is made, the ones which have lapsed and an accounting is made of the money collected and paid out.

The Saturday morning meetings are "Pep" meetings and the agents also get information as to any new policies written by the company with explanations as to their features. The meetings other than the Saturday ones "have more to do with the particular business of the agent in his particular territory." The agents are not supervised while making their collections. They spend their time any way they see fit. If they go to a ball game that is their own business. The company has nothing to do with the order in which the agent collects from the policyholders, or how he arranges his work, except that they must cover their debits once per week. He can start in the middle of the debit and work in any order he sees fit. Some of the agents walk and some use automobiles. The agents' accounts are audited periodically by the company. "Q. You do that with all men who are under your supervision or control? Is that true? A. Yes, sir. Q. And Mr. Krueger was one of those, of course? Mr. Nugent: I object to that. He assumes that the agent, Krueger, was under his control. The Court: Objection sustained."

Leftwick testified that none of the agents is required to use any particular means of transportation; that he knew Krueger was using an automobile in connection with the business of the company and he

made no objection; that Krueger was never required to use an automobile; that the company did not furnish any portion of the expense or the upkeep of the car; that Krueger was free to seek new policyholders at any time or place that his license from the State of Kansas permitted him; that the company could "fire" Krueger at anytime.

Apparently, Krueger, at first, made his debit on foot, but he testified that the company suggested that he get an automobile; "that it would help me out and to get around quicker;" that "they suggested and insisted it would be a great help to me;" that he purchased the automobile for this reason, and for the reason that his "wife wanted it any way." Krueger sometimes used this family automobile in covering his debit district, and was using it at the time of the collision involved in this action. He had made one collection and was on the way to make another one.

Leftwick was asked by counsel for plaintiff:. "Q. And he is required to make whatever physical movement it may take to go between those various accounts, is he not? A. Yes." Leftwick also testified that making collections was in the scope of the authority of Krueger, and that he had been working in the scope of his authority on the date the collision occurred in making the collections that he had made on that day.

Originally, the agents turned in what they called the "net." In other words, the amount collected, less their commissions, but later the manager suggested that all of the money be turned in and the commissions paid back on a designated day each week and this custom was followed. At the time of the trial the inspections of claims were all made by others than the debit agents.

Plaintiff insists that the evidence made out a submissible case against the company; that the evidence clearly shows that Krueger was in the performance of his authorized collection duties within his debit at the time and place of plaintiff's injury and, regardless of the terms of the oral contract existing at the time, the company actually controlled the movements of Krueger in the manner in which he performed his duties; that admittedly the company had the right to discharge him at will; that Krueger's duties were more or less routine and required very little supervision when he was away from the office; that in view of the fact that the policyholders paid Krueger the premiums in cash, the company would naturally keep a strict control over him; that the company changed the method of doing the work at will, etc.

The relationship of master and servant is one not capable of exact definition and cannot be defined in general terms with substantial accuracy. In this case there was no written contract between Krueger and the company. Whatever was the relationship between them is to be inferred largely from the way in which Krueger and the company conducted their business. As a result of this, the parties in their briefs have attempted to draw inferences from nearly every one of

the statements of the witnesses that have any bearing whatever on this matter and, as a result, very lengthy briefs have been presented on both sides. This has required a detailed statement of the facts. There is neither an agreement as to the inferences to be drawn from the testimony or as to the law applicable to the facts. However, it is agreed that in determining the matter the plaintiff is entitled to have all of the facts, and all inferences that may be drawn therefrom, taken in their most favorable light to him, and we will so consider the evidence.

There has been much written on the law of master and servant and principal and agent, but there has been much difficulty experienced by the courts in applying the law relating to such matters. In the first place it is important to determine whether the relationship between the company and Krueger was that of master and servant or principal and agent. This for the reason that the mere relationship of master and servant often gives rise to inferences of the existence of the right of control by the former over the latter, which is not always the case where the relationship of principal and agent exists.

"It is important to distinguish between a servant and an agent who is not a servant, since ordinarily a principal is not liable for the incidental acts of negligence in the performance of duties committed by an agent who is not a servant." [Restatement of the Law Agency, p. 485.]

The extent of the liability of the employer for the acts of his employee has undergone some revision in recent years. In this connection the emphasis given in some of the cases on the right to direct the terms of the contract as indicating, in a material degree, the responsibility of the employer for the acts of the employee, has given way to a consideration solely to the right of the employer to control the physical acts or movements of the employee at the very moment of the occurrence for which the employer is sought to be held responsible.

"A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." [Restatement of the Law Agency, p. 483.] "The important distinction is between services in which the actor's physical activities and his time are surrendered to the control of the master, and service under an agreement to accomplish results or to use care and skill in accomplishing results. *Those rendering service but retaining control over the manner of doing it are not servants.*" [Restatement of the Law of Agency, p. 485.] (Italics ours.)

The word "servant" does not necessarily refer to those rendering manual labor. The word indicates the closeness of the relationship of the one receiving and the one giving the service, rather than the nature of the service or the importance of the one giving it. Insurance agents, such as Krueger, are generally considered as agents

and not as servants of the company that employs them. [See Am. Nat'l. Ins. Co. v. Denke et al. (Tex.), 95 S. W. (2d) 370, 373; Income Life Ins. Co. v. Mitchell, 79 S. W. (2d) 572.] "It is only when to the relationship of principal and agent there is added that right to control physical details as to the manner of performance which is characteristic of the relationship of master and servant, that the person in whose service the act is done becomes subject to liability for the physical conduct of the actor." [Restatement of the Law Agency, pp. 559, 560.] The various statements of the law that we have quoted from Restatement of the Law of Agency have been adopted, expressly or in effect, by the courts of Kansas and Missouri. [See Vert v. Met. Life Ins. Co., 117 S. W. (2d) 252; Kourik v. English, 100 S. W. (2d) 901; Skidmore v. Haggard et al., 110 S. W. (2d) 726; Barnes v. Real Silk Hosiery Mills, 108 S. W. (2d) 58; Manus v. K. C. Distrib. Co., 74 S. W. (2d) 506; Snowwhite v. Met. Life Ins. Co., 127 S. W. (2d) 718; Hurla v. Capper Publ. Co. (Kas.), 87 Pac. 552; Dohner v. Winfield Wholesale Gro. Co. (Kas.), 226 Pac. 767; Redfield v. Chelsea Coal Co. (Kas.), 16 Pac. (2d) 475; McCraner v. Nunn (Kas.), 284 Pac. 603.]

Consequently, the question presented is whether Kruger, although merely an agent, was subject to the right in the company to control his physical movements or the manner in which he operated his automobile at the time of the collision. It is said that the test of one's liability for the act or omission of his alleged servant is his right and power to direct and control his imputed agent in the performance of *the causal act or omission at the very instant of the act or neglect.* The question presented is where rested the right of control of the physical movement of the automobile in question which was not owned by the company but by the agent who bore the entire expense of its operation. [Am. Nat'l. Ins. Co. v. Denke et al., *supra*; Stockwell v. Morris (Wyo.), 22 Pac. (2d) 189.]

While there are a number of things about the relationship between Krueger and the company that would indicate its control over his work, we are of the opinion that, viewing the whole testimony, the instructions and requirements given to Krueger concerning his work indicating a measurement of control over it, related primarily to the contractual features of his employment, and to the attainment of ultimate results, and not to physical details as to the manner of performance of his movements while soliciting, collecting, examining claims, attending meetings, driving his automobile, etc.; and, being of this opinion, we must hold that this control was not such as to create liability on the part of the company for his negligent act in the operation of his family automobile although, at the time, he may have engaged in the furtherance of the company's business. [Am. Nat'l Ins. Co. v. Denke et al., *supra*; State ex rel. v. Grimm (Wisc.), 259 N. W. 262; Ignatowtich v. McLaughlin (N. D.), 262 N. W. 352, 354.]

Plaintiff stresses the right in the company to discharge Krueger at any time the company saw fit. While, this is an important element in disposing of a matter of this kind, it, and the other matters pointed out by plaintiff indicating control of the company over Krueger, are not conclusive. [See Vert v. Met. Life Ins. Co., *supra*; Barnes v. Real Silk Hosiery Mills, *supra*; Skidmore v. Haggard, *supra*; Stockwell v. Morris, *supra*; Income Life Ins. Co. v. Mitchell, *supra*; Houdek v. Gloyd (Kas.), 107 Pac. 751.] The power to make alterations in plans is not controlling. [Barnes v. Real Silk Hosiery Mills, *supra*; Skidmore v. Haggard, *supra*.]

However, plaintiff contends that Krueger was engaged in collecting premiums within his debit at the time of the collision and this shows that his physical movements were subject to control on the part of the company. In support of this contention plaintiff cites Vert v. Met. Life Ins. Co., *supra,* and other cases. The only matter decided in that case was that the industrial insurance agent there involved, who also had authority to write ordinary life insurance, was not performing physical acts on the part of his company when he was on his way in his automobile to solicit a policy of ordinary life insurance outside of his debit. The court expressly stated that it was not deciding what would be the result had the agent been making collections inside his debit district. [See l. c. 255.] It is quite apparent that an insurance agent may make collections, sell insurance, etc., and be either an independent contractor or an employee. The mere fact that he sells industrial insurance, or works within a debit, does not make him a servant while so selling or working therein. The question always is whether control over the physical movements of the agent exists. It is possible to imagine a state of facts showing, a salesman of ordinary life insurance policies, having no debit district, as being a controlled agent. A salesman of industrial insurance may, under some circumstances, be under control and under others an independent contractor. It was the duty of plaintiff in this case to show that the physical operation of the automobile was actually directed by the company, or that it had the right to control it. As there is no evidence of any direction on the part of the superintendent to Krueger as to the operation of his automobile, the case hinges entirely upon the question of the right of control of Krueger's physical acts in operating it.

It is true in the Vert case, the court made a distinction *arguendo* between an industrial insurance agent making a collection within his debit and selling ordinary life insurance outside of his debit but we do not view the language in the opinion to indicate that the author thereof meant that, in every case, where the agent is making a collection in his debit district, he is under the control of the company in so doing, or, even under the facts stated in that case, because the court said, l. c. 256: That, when the agent in that case,

working on his own initiative solely for the purpose of bringing about contractual relations between his company and others "had an entirely different relationship with his principal than he did when performing his regular duties in his debit which included physical errands, which required his physical services to accomplish, *and which we may assume* the company had the right to direct,". (Italics ours) but did not so decide. It would thus appear that the court in that case assumed, but did not decide, that the company would have direction over the physical acts of the agent there under review, had he been performing his regular duties in his debit. Of course, making a mere collection, under some circumstances, might well amount to merely a physical errand requiring no particular discretion or skill. This is much recognized in the opinion in that case. The court did not attempt to analyze or pass upon the facts bearing upon the relationship between the agent and the company in that case while performing his duties in his debit, because no such duties were being performed when the casualty involved in that case occurred. At any rate, the extent of the right of control in that case far exceeds anything appearing in the case at bar. The right of control, as shown by the written contract in that case, seemed to cover every act of the agent. See the rules set forth at page 255 of the opinion, especially rule one, which says, among other things: "Agents have no discretionary power."

We do not view what was said in Met. Life Ins. Co. v. Gosney, 101 Fed. (2d) 167, 170, that, in Missouri, liability for injuries to a third person caused by the negligent operation of the automobile of an insurance agent while he is engaged in collecting premiums on industrial policies within his debit necessarily must be visited upon the company employing him. The word used was not "will" or "shall" but "may." We have examined the other cases cited by plaintiff and find them not in point.

Even if the relationship between the company and Krueger were that of master and servant, the former would not necessarily be liable for his negligence in colliding with plaintiff, while Krueger was driving his own automobile and in view of the decision in Riggs v. Higgins, 106 S. W. (2d) 1, we rule that under such circumstances, the company could not be said to control the physical conduct of Krueger, at the time of the collision, in any event, unless there was a direction to Krueger to drive the automobile to make the collections in question, or it is shown that it was necessary that he use it in the discharge of his duties, in this respect, or that the company reserved the right to control the manner or mode of Krueger's movements from place to place in the performance of his duties. In the case last cited the relationship between the company and the agent was very similar to that in the case at bar. However, Higgins' (the agent's) automobile involved in the collision in that case was being driven by

him in making a journey between Neosho, where his debt was located, and the branch office of the company, under which he worked, in Joplin, to attend a meeting at the latter point. The agents all attended these meetings and they came by any way, over any route or by any conveyance they chose. All that was required was that they be there. The court said: l. c. 3: "It is readily apparent that Higgins was in the general employ of appellant in the sense that a railroad conductor or street railway motormen are throughout their day's work." Of course, the relationship between the employer and such persons is that of master and servant.

In the case at bar there was no direction to Krueger to use his automobile in connection with any of the work of the company. The company suggested that he procure an automobile and insisted that it would be of help to him in his work but left it to his judgment whether he should use one, and it is not clear that he used it in his work at all times. It was not necessary that he use an automobile. The fact that he was a "free" agent in the selection of the means he used in making his rounds shows that the company reserved no right of control over the manner in which he performed his duties. [Riggs v. Higgins, *supra*.]

"A master is not liable for injuries caused by the negligence of a servant in the use of an instrumentality which is of a substantially different kind from that authorized as a means of performing the master's service, *or over the use of which it is understood that the master is to have no right of control*." (Italics ours.)

"(b) The fact that the instrumentality used by the servant is not owned by the master is a fact which may indicate that the use of the instrumentality is not authorized, or if authorized, that its use is not within the scope of employment. The master may authorize the use of a particular instrumentality without assuming control over its use as a master. The fact that he does not own it or has not rented it upon such terms that he can direct the manner in which it may be used indicates that the servant is to have a free hand in its use. If so, its control by the servant, although upon his master's business, is within the scope of his employment." [Restatement of the Law Agency, pp. 538, 539, 540.]

"To hold a master legally responsible for the act of a servant who is engaged in furthering his master's business and who while doing so negligently uses some instrumentality that carries him from place to place, it must either be proved that the master exercises actual or potential control over that instrumentality, or the use of the instrumentality at the time and place of the act complained of must be of such vital importance in furthering the business of the master that the latter's actual or potential control of it at that time and place may reasonably be inferred." [Wesclowski et al. v. John Hancock Mut. Int. Co. (Pa.), 162 Atl. 166, 167.]

We find that the holding in the case last cited is not altered or weakened by subsequent decisions in the State of Pennsylvania, such as Loper v. P. G. Publishing Co., 169 Atl. 374; Cusick v. Hutchison, 177 Atl. 749; Gittleman v. Hoover Co., 10 Atl. (2d) 411; Holdsworth v. Pennsylvania Power & Light Co., 10 Atl. (2d) 412.

We have examined the other cases cited by the plaintiff. In Chiles v. Met. Life Ins. Co., 91 S. W. (2d) 164, it was held that if the employer expressly or impliedly *consents* to the use in his business of an automobile being owned and operated by his employee, he is liable for the latter's negligence. in driving it while in use in the employer's business. This holding is in conflict with the case of Riggs v. Higgins, *supra,* which overruled some former decisions of the Supreme Court on the subject.

In Dillon v. The Prudential Ins. Co. (Calif.), 242 Pac. 736, the agent was working under detailed regulations from the company and under an agreement to give his entire time within specific hours to carry out the instructions of the company. He was paid a weekly salary and could have been discharged at any time. The company's book of rules and regulations described with the utmost detail his duties, his aims and purposes and the various results to be accomplished. It appears that, under the facts of that case, it was necessary for the agent to use an automobile in discharging his duties.

In Hall v. Sera (Conn.), 152 Atl. 148, the agent was given a book of instructions governing his conduct,-and it was necessary for him to have an automobile to properly perform some of his work. He received compensation insurance as an employee of the company as a result of the accident which was the subject-matter of the suit. The court said that it was not a question of whether the company had physical control over the movements of the car, but whether it had the right of general control over the driver, himself. This statement of the court is not entirely in harmony with the law of the States of Missouri and Kansas.

In Burdo v. Met. Life Ins. Co., 4 N. Y. S. 819 (a 3 to 2 decision), the agent had been regularly engaged almost exclusively in collecting premiums. He was required to give all of his time to the work. The use of the automobile involved in the accident in that case was necessary in the performance of the work, and the agent was made an allowance by the company for its use. Although the facts in that case are different than those in the case at bar, we are more impressed with the dissenting opinion in that case than the majority opinion.

In Miller v. Met. Life Ins. Co. (Ohio), 16 N. E. (2d) 447, the agent was given "every direction" as far as taking care of his territory was concerned. The court interpreted this to mean that he was subject to the direction of the company from time to time with respect to the work he was to perform and indicated the right of control. The expression "every direction" was so general in reference to the au-

thority of the company to direct the agent as to indicate, the court held, the right of control over the agent of his physical movements in the operation of the automobile involved in the collision in that case.

The evidence in the case at bar is explicit as to the directions given by the company to Krueger and shows that they involved nothing more than control over the results to be obtained, rather than the physical details of the work.

In Amstutz v. Prudential Ins. Co. (Ohio), 26 N. E. (2d) 454, the written contract provided that the agent should be under the instructions, etc., of the company and the superintendent of the company could instruct him to do anything. This was held to be general enough to show the right of control over the physical acts of the agent, the court saying: l. c. 456, by the use of the term "instructions" and particularly in the light of the testimony of Mr. Shindollar that "Mr. Speiser," (the superintendent) of course, could instruct him (the agent) to do anything, the trier of the fact was warranted in finding that the company reserved the right of control over the physical act of the agent.

We have examined the other cases cited by the plaintiff and find them not in point.

There is some controversy between the parties as to whether the law to be applied in this case is that of the State of Kansas or that of Missouri. As we find no difference in the law, as announced by the courts of last resort in the two States, this matter is unimportant.

It is insisted that the court erred in excluding a policy of liability insurance carried by the company. This policy insured it against loss from liability imposed by law for damages on account of bodily injuries, or death resulting therefrom, accidentally inflicted upon any person by any passenger type automobile used in the business of the company. The policy denominates the contract as a "Non-Ownership" contract and recites that it does not cover any automobile registered in the name of, owned, leased or hired by the company. It does not specifically describe what employees, agents and representatives of the company were covered, but recites that a specific description of the employees, agents and representatives was waived.

Whether there was material error, if any, in the exclusion of this policy, depends upon whether it is to be construed as affecting the relationship between the company and Krueger that, we think, was clearly shown by the other evidence in the case. We think that it does not have that effect. Of course, Krueger's name is not mentioned in the policy. The policy only protects the company from liability in the operation of automobiles by its employees, agents and representatives, their description not being given, in the event they should be on the business of the company. The policy does not purport to cover persons in the company's Kansas City office, alone, but apparently purports to cover all of its employees wherever situate, who

operate their automobiles in the company's business. The company may have employees who devote all of their time, including their automobiles, to the business of the company, under circumstances clearly showing control or the right of control over the driver and the automobile by the company. The evidence is silent on this subject. As the evidence shows that Krueger, at no time, drove his automobile under such circumstances as to give the right of control to the company over its operation, it is not clear that the policy was intended to cover him. From all the evidence shows, at most, the policy covered merely a contingent liability of the company for Krueger's negligence. [See Roso v. St. Louis Dairy Co., 98 S. W. (2d) 717.] There was no material error, if any, in excluding the policy.

The judgment is affirmed. All concur.