Eddie STOKES, by Next Friend, Opal
Stokes, (Plaintiff) Appellant,

v.

FOUR-STATE BROADCASTERS, Inc., a
*Corporation,* (Defendant) Respondent,
Kenneth Londo, (Defendant) Appellant.

No. 45422.

Supreme Court of Missouri,
Division No. 1.

April 8, 1957.

Bert Hurn, Neosho, Edward V. Sweeney,
Monett, for appellant Eddie Stokes.

Coyne & Patten, Joplin, for respondent.

HOLMAN, Commissioner.

On the afternoon of June 25, 1953,
plaintiff, Eddie Stokes, a nine-year-old pe-
destrian, received serious personal injuries
as he was crossing a street in Joplin, Mis-
souri, when struck by an automobile owned
and operated by Kenneth Londo. Acting
through a next friend, plaintiff instituted
this action seeking to recover damages in
the sum of $25,000 from Londo and his em-
ployer, Four-States Broadcasters, Inc. At

the close of plaintiff's evidence the court sustained the motion of the corporate defendant for a directed verdict. At the conclusion of the trial the jury returned a verdict for plaintiff in the sum of $25,000 against defendant Londo and a verdict (in response to the court's direction) in favor of the other defendant. Plaintiff and Londo each filed notices of appeal but said defendant has taken no further steps to perfect his appeal and same is accordingly dismissed. 42 V.A.M.S. Supreme Court Rule 1.15. We will proceed to review the appeal of plaintiff from the judgment entered upon the directed verdict in favor of defendant Four-States Broadcasters, Inc.

Plaintiff sought to recover against the corporate defendant upon the doctrine of respondeat superior alleging that, at the time of the accident, Londo was operating his automobile in the business of said company as its agent, servant, and employee, and subject to its control, direction, and authority. The sole question upon this appeal is whether the evidence was sufficient to make a case for the jury upon that issue. The only evidence on that question was the testimony of defendant Londo who was called as a witness by plaintiff.

At the time of the unfortunate casualty Londo resided in Wyandotte, Oklahoma, and had been employed by Four-States Broadcasters for almost three years as one of the engineers at its transmitter station located about four miles northwest of Joplin. He testified that he was subject to the directions of Ralph Meador, the chief engineer at the station; that Meador was the man who hired him and had the authority to discharge him if he failed to carry out his orders; that the programs originate in the studio at 1027 Main Street in Joplin and are sent over telephone wires to the transmitter where they are amplified and broadcast over the air.

The witness testified further that a schedule of the programs to be broadcast each day was made up in the office at the studio and that it was the common practice to have a copy of the program schedule at the transmitter to facilitate the work of the engineers; that Mr. Meador had instructed him to "pick up" the schedule at the studio and deliver it to the transmitter, and that it had been his customary practice to do so as he went to work unless someone else had previously brought it out. His testimony indicates that other engineers may, in like manner, have at times "picked up" the schedules.

On the day of the accident Londo drove from his home in Wyandotte, Oklahoma, in his own car, apparently en route to his work at the transmitter. As he went through Joplin he stopped at the studio and "picked up" the program schedule for the next day. The accident in question occurred shortly after he left the studio. We quote the following from his testimony:

"Q. Now, how long had you been making deliveries of the program schedules from the studio to the transmitter before this date in question? A. Well, I had been delivering them as long as I had been working there if they were not already out there.

"Q. What route did you take from the time that you left the studio in making your delivery of the program schedules, what was your customary route from the studio to the transmitter? A. I had no specified route.

"Q. Did you have a route that you followed as a matter of routine so to speak? A. Well, out of force of habit, I took the route that I had taken the day of the accident. * * *

"Q. If somebody else hadn't picked it up and brought it out, you stopped by and picked it up, is that right? A. That is right.

"Q. And it wasn't compulsory that you do it, was it? A. Well, if I hadn't picked it up, I wouldn't have got fired for it.

"Q. This schedule that you picked up, that wasn't for that day's schedule, it was for the next day, wasn't it? A. Yes.

"Q. And so long as it got out there by the next morning, that was sufficient, wasn't it? A. That is right. * * *

"Q. Now, as a matter of fact, when you registered in out at the mechanical station out there northwest, you have to sign a log, don't you? A. Yes, sir.

"Q. And that is when your day's work starts, isn't it? A. Yes, sir.

"Q. And that is when you become in control of the machinery out there, when you sign the log? A. Yes, sir.

"Q. And you are in control of it out there until your hours are up? A. Yes, sir. ·

"Q. Now, do you receive any money from the company for operation of that car? A. No, sir.

"Q. Was any money paid you by the company for the use of your automobile? A. No, sir.

"Q. And did the company, either any of its bosses or officers have control or supervision over your car? A. No. They had no control over my car.

"Q. They didn't tell you how to go out and the road to take to. the station from their studio? A. No, sir.

"Q. They didn't tell you how to operate the car as you went out there? A. No, sir.

"Q. You could have picked it [the schedule] up in the morning if you had wanted to and carried it around all day, couldn't you? A. Yes.

"Q. And you did pick it up about what time? A. About 4 o'clock.

"Q. And after you picked this up, this schedule, you could go any place you wanted to, couldn't you? A. Yes.

"Q. Had you ever picked it up before in the morning and carried it around with you all day? A. A lot of days, I picked it up at night and took it home with me and bring it back with me.

"Q. A lot of days, you would pick it up at night and take it down to Wyandotte and bring it back the next day? A. Yes, sir. * * *

"Q. Mr. Londo, did you say that if you had disobeyed the instructions given you by Mr. Meador and not delivered these program schedules, that you would not have been fired? A. No, sir, because I missed several times of picking them up, because sometimes I wouldn't have had time to have gotten to work if I had of stopped and picked them up. * * *

"Q. Was your automobile equipped with a license or a designation showing your connection with the station KFSB? A. I had a white tag with the letters KFSB on the front bumper."

No definite rule has been formulated by which it may be determined in every instance whether the driver of an automobile, in the general employment of another, was acting within the scope of his employment, and under the control of his employer, at a given time so as to render his employer liable for his negligence in driving the vehicle. That determination must necessarily depend upon the facts and circumstances of each case. The burden was upon the plaintiff to present some evidence from which it could be reasonably inferred that the relation of respondeat superior existed at the time of the occurrence in question. In reviewing the sufficiency of the instant evidence we will view the evidence, and all fair and reasonable inferences to be drawn therefrom, in the light most favorable to plaintiff.

Plaintiff here contends that the facts in evidence clearly establish the existence of a master-servant relationship between Londo and the respondent at the time of the instant casualty and hence the court erred in directing the verdict in question. In support of this contention plaintiff points to the evidence indicating (1) the general employment of Londo, (2) the fact that Londo had been directed by Meador to "pick up" the program schedules, and Mea-

dor was his superior with authority to discharge him if he failed to carry out his orders, and (3) that Londo was on his way to the transmitter with the program schedule in his possession at the time of the accident.

The cases plaintiff relies on in support of his position are Corder v. Morgan Roofing Co., 350 Mo. 382, 166 S.W.2d 455, Hammonds v. Haven, Mo.Sup., 280 S.W.2d 814, and Burgess v. Garvin, 219 Mo.App. 162, 272 S.W. 108. We have the view that each of these cases involve factual elements and circumstances not shown to exist in the instant case and hence are not controlling herein.

In the Corder case the employee involved was a foreman whose duties frequently required that he travel to various cities to supervise work undertaken by the Roofing Company. In so doing he was permitted to use his car and his employer would pay him an amount equal to the railroad fare to and from the particular town. On the occasion in question he had been on a job in Marshall, Missouri, for a week and on Saturday called the office of his employer at Joplin and obtained permission to return to Joplin that day. It was on that trip that the accident occurred. We affirmed a judgment against the employer. It should be noted, however, that the employee was not only compensated to some extent for the expense of operating his car, but testified that he was returning to the home office in order to file his weekly report and to confer with the officials of the company concerning the future progress of the work and to decide what additional men and materials would be needed to complete it. The difference between that situation and the one before us is readily apparent.

The Hammonds case concerned a sales manager who was involved in an accident while returning in his own car from a meeting of the salesmen of his employer held for the purpose of disseminating information and presenting the company sales program. The sales manager had been directed by the company officials to call this particular meeting. While the question was admittedly close, we held that the evidence was sufficient to justify a finding that he was attending to the business of the employer in response to its orders and was, at the time, subject to its right of control.

In the Burgess case the employee was engaged in the door-to-door selling of goods for a mercantile company and also, on the date of the accident, was "breaking in" a new salesman. In selling its goods his employer required that he follow rather strict rules, particularly as to mortgages frequently taken to secure unpaid balances of the sales price and which were made payable to and collected by the mercantile company. It was held that a jury question was presented as to the existence of the relationship of respondeat superior. We find little similarity between that and the instant case and hence do not consider it applicable.

The law in relation to cases of this nature seems to be well settled, but, as we have indicated, its application to a given state of facts is often difficult. Many of the cases are close on the facts. However, a careful consideration of the evidence in the instant case, in the light of the applicable rules as stated in the cases, has convinced us that the evidence is not sufficient to reasonably authorize an inference that the legal relationship of master and servant existed between the respondent and Londo at the time of the accident in respect to the very transaction out of which plaintiff's injury arose.

In reaching the foregoing conclusion we have considered the casual and incidental nature of the service Londo was performing in its relation to the failure of plaintiff to show that respondent was exercising any control or had any right to control the physical movements of Londo at the time of this occurrence, which omission we consider decisive of the issue before us. In this connection it should be noted that, under certain circumstances, acts on behalf

of an employer have been held to be so casual and incidental that they are not considered an inducing factor in a car movement and the employer is said not to be responsible for the employee's negligence occurring thereon. Sowers v. Howard, 346 Mo. 10, 139 S.W.2d 897; Wines v. Goodyear Tire & Rubber Co., Mo.App., 246 S.W.2d 525; Van Hook v. Strassberger, Mo.App., 259 S.W.2d 399; Mullally v. Langenberg Bros. Grain Co., 339 Mo. 582, 98 S.W.2d 645; J. C. Penney Co. v. Oberpriller, 141 Tex. 128, 170 S.W.2d 607. While we do not base our decision herein upon that rule we think the factors involved should be considered in their overall relationship to the vital question of right of control.

In considering the instant question we call attention to the fact that in compliance with Meador's instructions Londo would "pick up" the schedule on his way to work if no one else had previously delivered it to the station, and (apparently without serious objection) would not stop and get it at all if such action would cause him to be late to work. It is significant that upon a number of occasions he obtained the schedule on his way home in the evening and would bring it to the studio the next day when he came to work. He was not reimbursed for the expense of operating his car and, in fact, could have used any other means of available transportation. The foregoing tends to indicate that the act of Londo in "picking up" the schedule with more or less regularity was a casual, gratuitous act which he performed when necessary and convenient, at a time of his own choosing. There is no indication that he ever delivered the schedule to the station except when he was going there to report to work, a trip he would have made irrespective of any delivery of the schedule. Moreover, it should be noted that the schedule in question would not have been needed at the transmitter until the next day and that Londo testified that his day's work started when he signed the log at the station.

"A servant is a person employed to perform service for another in his affairs and who, with respect to his physical conduct in the performance of the service, is subject to the other's control or right to control." Restatement of the Law of Agency, p. 483. "Those rendering service but retaining control over the manner of doing it are not servants." Restatement of the Law of Agency, p. 485. There seems to be no doubt but that the ultimate question for our determination is whether Londo, on the occasion in question, was subject to the control or right of control of Four-States Broadcasters in his physical movements in respect to the delivery of the schedule in his possession at the moment plaintiff was injured. As previously indicated, that question must be answered in the negative. Glynn v. M. F. A. Mut. Ins. Co., 363 Mo. 896, 254 S.W.2d 623, 36 A.L. R.2d 256; Klotsch v. P. F. Collier & Son Corporation, 349 Mo. 40, 159 S.W.2d 589; Riggs v. Higgins, 341 Mo. 1, 106 S.W.2d 1; Douglas v. National Life & Accident Ins. Co., 236 Mo.App. 467, 155 S.W.2d 267; Khoury v. Edison Electric Illuminating Co., 265 Mass. 236, 164 N.E. 77, 60 A.L.R. 1159; 35 Am.Jur., Master and Servant, Section 3, p. 445.

There can be little doubt but that the employer had the right to control Londo in the performance of his duties after he signed the log and entered upon his work as an engineer and radio operator at the station. However, it is equally clear that it did not control or have any right to control his physical movements on the occasions that he delivered the schedule to the transmitter station. He testified unequivocally that none of the "bosses" or officers of the company had any control or supervision over his car or the manner, means, or route by which he would go from the studio to the station. There was no fact or circumstance developed in evidence which would reasonably support an inference to the contrary. If no one else delivered the schedule to the station Londo would stop for it at any convenient time

after it was prepared, and would keep it until he was next at the station. He would often get it at night and take it to his home in Oklahoma and return with it the next day. All of this evidence demonstrates very clearly that the only interest of the company in regard to the delivery of the schedules was that they be available at the station when needed. Aside from that result to be accomplished, there is nothing to indicate that the company had any right of control over the time of delivery or the manner or means by which it would be accomplished.

In respect to the delivery of the schedules, Londo's relationship to the company was somewhat like that of an independent contractor. In any event, since no right of control was shown, it cannot be said that he was a servant at the time of this casualty. While not precisely the same, we think the situation before us is similar to that stated in the following illustration: "A, an assistant in a butcher shop, is asked by his master, P, to stop on his way home from work and leave some knives to be ground at a machine shop which is on A's usual route to his home. Unless P entrusts A with a vehicle over which it is understood that the master is to have control during such period, A, although an agent in arranging for the sharpening of the knives, is not a servant in going to or from the place of purchase." Restatement of the Law of Agency, p. 523.

Since it appears that the doctrine of respondeat superior was not applicable in the instant factual situation, it follows that the trial court properly directed a verdict in favor of the Four-States Broadcasters, Inc.

Judgment affirmed.

VAN OSDOL and COIL, CC., concur.

PER CURIAM.

The foregoing opinion by HOLMAN, C., is adopted as the opinion of the court.

All concur.